## CROUCH v. UNITED STATES.

District Court, E. D. South Carolina. July 13, 1928.

Huger, Wilbur, Miller & Mouzon, of Charleston, S C., for petitioner.

J. D. E. Meyer, U. S. Atty., of Charleston, S. C., and Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C.

ERNEST F. COCHRAN, District Judge. The plaintiff brought this action under the Tucker Act (24 Stat. 505) for damages in the sum of $4,076.50, caused by loss of a pile driver which the plaintiff had rented to the government. The plaintiff also claims seventeen days rental.

The answer sets forth in substance that the defendant had paid the sum of $58.50 for three days' use of the pile driver; that the pile driver had been sunk and damaged by a severe storm, although the defendant had used reasonable care to prevent the same, and denied that the defendant was liable either for the damages or for the seventeen days rental.

The case was heard by me, and the testimony taken and the evidence submitted in open court.

## Opinion.

The first question to be considered is one of jurisdiction. It is contended on the part of the government that the case sounds in tort for alleged negligence, and jurisdiction is therefore excluded by the terms of the Tucker Act. But I do not think this conclusion is sound. There was undoubtedly a written contract entered into for the rental of the pile driver by the officers of the government, who had authority to make such a contract. The government was therefore a

bailee for hire, and under an implied obligation to use reasonable care in the use of the property and for its preservation. If a bailee for hire is guilty of negligence, and the property through such negligence is either lost or damaged, he is liable to the bailor, not for a tort, strictly speaking, but upon the implied obligation to use due care arising out of the contract. If the contract had in express terms required the use of due care, the action could hardly be said to be one sounding in tort. The fact that the obligation to use due care arises as an implied obligation from the contract cannot change the situation. The suit, therefore, can be maintained under the Tucker Act as a suit upon implied contract.

This conclusion I think is abundantly sustained by the decisions. In the case of U. S. v. Bostwick, the Supreme Court held that, when the United States contracts with its citizens, it is controlled by the same laws that govern its citizens in that behalf, and that all obligations which would be implied against the citizen under the same circumstances will be implied against the United States. That case was a case between a landlord and the United States as tenant, and it was held that there was an implied obligation on the part of the United States, growing out of their relation to the petitioner as lessees to use due care. U. S. v. Bostwick, 94 U. S. 53, 65, 66, 24 L. Ed. 65.

In the case of Clarke v. U. S., there was a contract for the use of a vessel by the government, and the vessel was lost in a storm, but without any negligence on the part of the employees of the government. In that case the Supreme Court said that the implied contract was such as arose upon a simple bailment for hire, and the obligations of the parties were those as were incidental to such a bailment; that a bailee for hire is only responsible for ordinary diligence, and liable for ordinary negligence in the care of the property bailed, and that, as no negligence was attributed to the government in the case, the loss must fall upon the owner. Clarke v. U. S., 95 U. S. 539, 542, 543, 24 L. Ed. 518.

The government, however, relies further upon the case of Bigby v. U. S. But in that case there was no contract whatsoever from which an implied contract could arise. That was a case merely of a suit against the government for injuries caused by the fall of an elevator operated by the government. The court held that such an action was clearly an action in tort, and therefore the jurisdiction was excluded under the Tucker Act.

Bigby v. U. S., 188 U. S. 400, 23 S. Ct. 468, 47 L. Ed. 519.

The government also relies upon Occidental Construction Co. v. U. S. But in that case the officers of the government were not authorized to enter into the contract for the hire of the property in question, from which it was sought to raise the implied contract. Here there is a contract for the rental of the pile driver, which the government officers were authorized to make, and that case is not in point in the present case. Occidental Construction Co. v. U. S. (C. C. A. 9th) 245 F. 817.

Under these decisions, I think that the vital question in the case is whether or not the government agents were negligent. If the damages incurred were on account of the storm, then the defendant is not liable. If, however, the government officers by the use of due care could have avoided the damage to the vessel, it was their duty to do so, and the failure to exercise such care would make the government liable for any damage resulting, by virtue of its implied obligation arising out of the express contract. This question of negligence is a question of fact, and the court has been greatly handicapped in reaching a correct solution. The loss of the pile driver occurred in April, 1915. The plaintiff brought no suit until July, 1916. It was suggested at the hearing that the delay in part was caused by the entry of the United States into the World War. But the United States did not enter the World War until April, 1917, and there was a period of nearly two years in which the plaintiff could have brought the case forward. However, I am not aware of the reasons for failure to bring the case forward in the time of my predecessor. There would appear to have been ample opportunity, after the ending of the World War, for this case to have been heard.

Be that as it may, certainly within the last 4½ years there was no effort made on the part of any of the parties to bring the case forward. The case was set down upon a special docket by the court, and the parties notified that they must be ready for trial and dispose of the case. Of the crew of the Snowdrop, not one is now available as a witness, except the cook, and he could hardly be presumed to know very much about the matter, except the bare facts coming under his observation. Capt. R. H. Lockwood, of the Cecilia, is dead, and his testimony unavailable. In the 13 years that have elapsed since the transaction in question, the memory of the few witnesses still available must necessarily have become more or less hazy

and uncertain. From these observations, it is not to be inferred that the court means to suggest that the plaintiff should be denied any right which may have been established, by reason of the delays and the unfortunate loss of the testimony of the witnesses. But in such circumstances the court will scrutinize the case very carefully, and is not disposed to attribute negligence on the part of the government officers hastily or lightly. The counsel on both sides have done all that they can to assist the court in reaching a correct conclusion. It may be observed that none of the present attorneys were originally engaged in the cause, and necessarily they are not as familiar with the case as those who first had charge of it.

In considering the question of fact as to whether or not there was negligence, the charges may be ranged under three heads, to wit: (1) That it was negligence to take the pile driver out at all with a storm coming up. (2) That there was negligence in not making a proper use of the services of the Cecilia. (3) That there was negligence in taking the crew off of the pile driver and leaving her without a crew on the night in question.

As to the first proposition, I am clearly of the opinion that it is untenable. The evidence is overwhelming that, at the time the Snowdrop took the pile driver in charge and proceeded with her to Fort Sumter, the weather was fair, and there was no indication of any storm, or that there would be the slightest danger in taking the pile driver over at that time.

As to the second charge, it must be conceded that in some aspects the evidence presents rather a strange situation. There can be no doubt that the Cecilia was employed, that her commander was thoroughly competent, skilled, and experienced, that she was thoroughly equipped, that the plaintiff (the owner of the pile driver) was notified of her employment, and acquiesced in it, and was thoroughly satisfied. There can be no doubt also that, when the Cecilia arrived, she could not get in close enough to the pile driver, on account of the depth of water. Efforts were made by the Cecilia, assisted by the Snowdrop, to get a line on the pile driver, and then proceed to tow her to a safer place, but they all proved unavailing. The only point that seems strange is why the Cecilia did not attempt to use her own hawser. Upon that point, the testimony is that Capt. R. H. Lockwood said that it would cost $25 to wet the hawser. Capt. R. H. Lockwood unfortunately is not here to explain this transaction, or to say why he did not make

further efforts to rescue the pile driver. But Capt. Gregg, a reliable witness, testified positively that he told Capt. R. H. Lockwood that it was not a matter of expense, and to do what was necessary to save the pile driver and to get equipment, if necessary, from Castle Pinckney. But for some reason, which is not explained, and which in all probability could be explained by Capt. R. H. Lockwood, if he were alive, Capt. Lockwood decided that the Cecilia could do nothing further towards rescuing the pile driver. The probabilities are that he came to the conclusion that the pile driver was in no immediate danger. Capt. J. J. Lockwood testified positively that, when the Cecilia left, the pile driver was apparently in no danger and could stay where she was through the night. He, however, knew nothing as to the nature of the contract between the representatives of the government and Capt. R. H. Lockwood, and knew nothing of the reasons why the Cecilia made no effort to use her own hawser. In view of all the circumstances and the lapse of time, resulting necessarily in weakening the memory of the few remaining witnesses, I do not think that it has been sufficiently shown that there was any negligence attending upon the efforts of the Cecilia.

As to the third charge, that there was negligence in taking the crew off of the pile driver after the Cecilia left. The Cecilia left about 5 o'clock, and, as already stated, it was testified positively by Capt. J. J. Lockwood that at that time the pile driver was apparently safe and could continue safely through the night. After the Cecilia left, and at about 5:30 o'clock, the captain of the Snowdrop took the crew of the pile driver off, and the pile driver was anchored and left for the night. It is urged that this constituted negligence; but I do not think that this action was necessarily negligent. The only witness who was present when this was done, and the only witness who knew anything about the condition of the pile driver at that time, was the cook, Louis Miller; but it is not to be expected that a cook would know anything of the reasons which impelled the captain of the Snowdrop to take the crew off, and he did not, in fact, undertake to testify in that respect at all. The captain of the Snowdrop and the other members of the crew are not here to give the reasons why this was done. It may have been done because it was thought that the pile driver was perfectly safe, as testified by Capt. J. J. Lockwood. It may have been done because, while the pile driver apparently was safe, yet from her injuries she might be in danger of sinking and the lives of the crew be lost,

and the captain of the Snowdrop might have thought it was best to take the crew off and run no risk as to their lives, but to run what risk there was as to the pile driver.

It is argued that, if the crew had been allowed to remain on board, they could have kept the pile driver pumped out and thus preserved it. But no witness who knows the facts has testified to that. Capt. J. J. Lockwood testified that it would be possible, but he was not aboard the pile driver, and knew nothing whatever of her condition or the condition of her pumps. Her pumps may have been damaged, or she may have been so filled with water that it would have been impossible to have pumped her out. We do not know fully what the internal condition of the pile driver was. We do know that she must have been battered considerably by the storm, and there was some testimony that her decks were not in good condition. The action of the captain of the Snowdrop in taking the crew off does not constitute negligence per se. It does not necessarily imply a want of due care. If the case had been brought forward at an earlier time, when the witnesses were available, such action might have been very easily explained.

Upon consideration of the whole matter, I do not think there is sufficient evidence of negligence on the part of the government in this or any other respect. The pile driver was lost, and the damages sustained were from the storm, an act of God, for which the United States is not liable in the absence of negligence.

The only other question of fact that needs any discussion would be the question of damages. In the view I have taken of the case, the question of damages becomes a moot one; but the plaintiff is entitled to a finding of fact upon that question, for an appeal or for other reasons. Upon that question there has been quite a conflict of evidence also. The question of values of property and of damages thereto is always difficult. It is rendered specially difficult in a case like this, where the witnesses are called upon to testify as to values 13 years ago, before the inflation and present high prices. We have been so accustomed in the last few years to high prices that it is difficult for men to realize that such low prices prevailed only a few years ago, and those prices seem really like a dimly remembered dream. In this case I think (as is usual in most cases of questions of value and of damages) the witnesses on one side have their figures too high, and on the other side a little too low. I have no doubt that they are all honest and sincere in their testimony. Without entering into any

discussion as to the method by which I have reached my conclusion, I think that the damages should be fixed at the sum of $1,630. I have excluded from this sum all claims of rental for the pile driver, because the first 3 days were paid for, and for the 17 days remaining of the contract period the government is not liable because the pile driver was lost.

I therefore make the following findings of fact:

(1) On May 15, 1915, the Department of Commerce, Lighthouse Service, under authority of law, on behalf of the United States, called for sealed proposals in the manner and form following:

completely in the possession and control of the agents of the government.

(5) The pile driver was a floating pile driver for use on the water, but had no means of self-propulsion, being entirely dependent on outside motive power. Her crew was furnished by the plaintiff, as required ·by the contract, and consisted of an engineer and two hands.

(6) On May 27, 1915, the ·government vessel Snowdrop had a crew consisting of a captain, engineer, cook, and deck hand. At the time of the trial of this case, the captain was dead, the engineer was in Norway, the whereabouts of the deck hand was unknown, and the only available person of the crew as

| Quantity Wanted. | Unit of Measure. | Description of Articles or Services. | Net Price per Unit. |
|---|---|---|---|
| 10 days | Day | Hire of pile driver and crew of engineer and two hands, crew to subsist themselves. Driver to be equipped with suitable apparatus, supplies and jet pump for jetting, driving and handling 45 foot concrete piles in Charleston Harbor, S. C., about May 20, 1915. | |
| | | | 19.50 |
| | | No payment will be allowed for Sundays or holidays unless driver is actually used on construction work on these days. | A discount of 2 per cent. will be allowed for cash within ten days after completion. |
| | | All towing will be done by the lighthouse tender Snowdrop. | |

The pile driver shall be equipped with anchors, mooring lines, and tools required for the class of work mentioned above. The engine shall have sufficient power to hoist a forty-five foot concrete pile or four tons on a single ship, or the gins be rigged with steel wire rope and blocks to satisfactorily perform the work. The hull shall be seaworthy, gins well braced and sound, head block and sheaves in good condition and a suitable toggle provided for holding the piles in position. Engine shall preferably be double cylinder double drum.

The successful bidder's plant will be examined to ascertain if, in the opinion of a representative of the government, it is suitable for the work. Any deficiencies or defects in equipment must be made good by the contractor at his expense.

(2) On May 19, 1915, the plaintiff, H. W. Crouch, proposed to furnish the articles ·or services bid upon in the foregoing schedule and subject to the conditions thereon, at the prices hereinabove set forth.

(3) The plaintiff was the owner of the pile driver in question.

(4) Before the government accepted the pile driver under the plaintiff's proposal, the same was inspected by a representative of the Lighthouse Department, and after certain repairs and alterations had been made, including certain repairs to the deck of the lighter itself, the pile driver was accepted as a satisfactory compliance with the terms of the bid and was taken in charge for the government by Capt. Redell of the United States lighthouse tender Snowdrop on the morning of May 25, 1915, from which time she was

a witness was the cook, Louis Miller, who testified at the trial.

(7) The pile driver was to be used for work in Charleston Harbor, in the vicinity of Ft. Sumter. The location was a safe one under ordinary conditions, but during a ·severe storm might become an unsafe place for a vessel like a pile driver, unless properly secured by proper moorings.

(8) On the morning of May 27, 1915, the Snowdrop took the piledriver in charge and proceeded with it to the site of the work, near Ft. Sumter. At that time the weather was good; there was no indication of any storm, or that there would be any danger to the pile driver. Before the pile driver could be made fast to the moorings provided for it, a storm came up and prevented it being made fast. The Snowdrop made every effort to pass. a line to the pile driver and get it to a place of safety. In this the Snowdrop was assisted by a boat from the Coast Guard Service. These efforts, however, proved unavailing, and the pile driver continued drifting and tending to get into shallower water and go ashore.

(9) Some time between 1 and 2 o'clock p. m., a representative of the Lighthouse Department arranged with Capt. R. H. Lockwood, who was in command of the seagoing tug Cecilia (owned by private individuals),

to go to the assistance of the pile driver and tow it to a place of safety. At the time of the trial, Capt. R. H. Lockwood had been dead some years. His evidence had not been taken before the trial, and his version of the situation is therefore not before the court. The Cecilia was a powerful tug, thoroughly equipped for wrecking and salvage purposes; her commander was thoroughly competent, skilled, and experienced; and her commander's instructions from the government agents were to do what was necessary for the safety of the pile driver.

(10) The Cecilia went out promptly. Upon arrival at the scene, however, it was found that the Cecilia drew too much water to go near enough to the pile driver to get a line to her. The Snowdrop and the Cecilia endeavored to get a line from the pile driver to the Cecilia, but without success. The commander of the Cecilia decided that his boat could do nothing further, and left for Charleston in the late afternoon, about 5 o'clock. At that time, the storm had abated, and the pile driver was apparently safe, and apparently in no danger of sinking during the night.

(11) After the Cecilia left, the commander of the Snowdrop, at about 5:30 p. m., took off the crew from the pile driver, and the pile driver was anchored and left for the night. The evidence does not disclose why this was done.

(12) During the night, the pile driver sank. Thereafter the government boat Cypress fished up certain portions from the pile driver, and finally dragged or towed it under water over to Castle Pinckney. It and the parts recovered were then tendered to the plaintiff. The plaintiff accepted certain parts which had been recovered, but refused to accept the remaining parts, on the ground that they had been rendered worthless and would cost more to repair than the construction of a new pile driver.

(13) The evidence fails to show any negligence on the part of the government or its agents, either in attempting to prevent the sinking of the pile driver or in salvaging as much of it as possible after it had sunk.

(14) The plaintiff, by reason of the breaking up of the pile driver and loss of the parts thereof, has been damaged in the sum of $1,630.

(15) The government has paid for the rental of the pile driver for three days which it had it in possession before it sank, but has refused to pay any rental for the period after its sinking, and has refused to pay any of the damages claimed.

I conclude as matter of law as follows:

Conclusions of Law.

(1) That this court has jurisdiction of the cause.

(2) That by reason of the contract entered into between the parties there was established between the plaintiff and the United States the relation of bailor and bailee of the pile driver in question.

(3) That the defendant, the United States, is not liable for the damages to the pile driver, in the absence of negligence on the part of its agents.

(4) That the agents of the government were not negligent, and that the United States is therefore not liable for the damages to the pile driver.

(5) That the United States is entitled to a decree dismissing the petition and complaint.